# In the United States Court of Federal Claims

No. 10-193C
(Filed July 7, 2011)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SHARON RAULERSON, et al.,
For Themselves and as Representatives
of a Class of Similarly Situated Persons,

et al.,

             Plaintiffs,

             vs.

THE UNITED STATES OF AMERICA,

             Defendant.

Takings; the Trails Act;
appropriate measure of just
compensation

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

*Thomas S. Stewart* and *Elizabeth McCulley*, Baker Sterchi Cowden & Rice, L.L.C., Kansas City, MO, with whom were *Brent Baldwin*, *Steven M. Wald*, and *J. Robert Sears*, St. Louis, MO, for plaintiff.

*Peter C. Whitfield*, Trial Attorney, Environmental & Natural Resources Division, United States Department of Justice, Washington, DC, with whom was *Ignacia S. Moreno*, Assistant Attorney General, for defendant.

## OPINION

MARGOLIS, Senior Judge.

This matter comes before the Court on the parties' cross-motions for partial summary judgment for a determination of just compensation for the taking of plaintiffs' reversionary interests in a railroad easement. A hearing was held in Court on June 9, 2011. Plaintiffs' motion for partial summary judgment is granted, and defendant's motion is denied.

### I. Background

#### A.    The Trails Act

The National Trails System Act Amendments of 1983 ("the Trails Act"), 16 U.S.C. § 1247, authorize the Surface Transportation Board ("STB") to "preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as

recreational trails." *Preseault v. Interstate Commerce Commission* ("*Preseault I*"), 494 U.S. 1, 6 (1990).  In order to accomplish this purpose, the Trails Act allows the owner of a railroad easement "wishing to cease operations along a particular route [to] negotiate with a State, municipality, or private group that is prepared to assume financial and managerial responsibility for the right-of-way." *Id.* at 6-7 (citing 16 U.S.C. § 1247(d)).  An easement holder seeking to enter into such an arrangement must apply to the STB for a Notice of Interim Trail Use or Abandonment ("NITU"), which "provides a 180-day period during which the railroad may discontinue service, cancel tariffs, and salvage track and other equipment, and also negotiate a voluntary agreement for interim trail use with a qualified trail operator." *Id.* at 7 n.5 (citing 49 C.F.R. §1152.29).  "If agreement is reached, interim trail use is thereby authorized" by the STB, and the NITU remains in effect indefinitely; if not, the NITU "automatically converts into an effective … notice of abandonment." *Id.*

**B.**    **The Port Royal Railroad Line**

Since 1985, the Port Royal Railroad Line, a 25-mile corridor connecting Yemassee, South Carolina to Port Royal, South Carolina, has been owned and operated by various instrumentalities of the State of South Carolina, including the South Carolina State Ports Authority, the South Carolina Public Railways Commission, Beaufort Railroad Company, and Tangent Transportation Company (collectively and variously, "South Carolina").  On or around May 30, 2008, however, South Carolina agreed to enter into an interim trail use agreement, commonly referred to as a "railbanking" agreement, with the Beaufort-Jasper Water and Sewer Authority ("BJWSA").  In order to effectuate the railbanking agreement, South Carolina and the BJWSA applied for an NITU, which the STB issued on May 20, 2009.  Plaintiffs are members of an opt-in class consisting of persons who on May 20, 2009 owned an interest in lands constituting a certain part of the Port Royal Railroad Line.  After issuance of the NITU, plaintiffs filed a complaint seeking just compensation under the Fifth Amendment to the United States Constitution.  According to plaintiffs, the issuance of the NITU effected a taking by imposing a new trail use easement and preventing reversion of the railroad easement.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  RCFC 56(c)(1).

## III. ANALYSIS

The parties assume for purposes of summary judgment that the interim trail use authorized by the NITU imposes an additional burden on plaintiffs' property, resulting in a taking under the Fifth Amendment.  The parties disagree, however, on how just compensation should be measured for that taking.  According to plaintiffs, the appropriate measure of just compensation is the difference between the value of plaintiffs' land *unencumbered* by a railroad easement and the value of plaintiffs' land encumbered by a perpetual trail use easement subject

2

to possible reactivation as a railroad.  Defendant proposes that a proper determination of just compensation is the difference in value of plaintiffs' land *encumbered* by a railroad easement and plaintiffs' land encumbered by a trail use easement subject to possible reactivation as a railroad easement.

Section 8(d) of the Trails Act provides that interim trail use "shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d).   "This language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests." *Preseault I*, 494 U.S. at 8. "While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations." *Id.* By preventing interim trail use from being treated as abandonment, "Congress prevented property interests from reverting under state law." *Id.* "A taking occurs when [those] state law reversionary property interests are blocked [by issuance of the NITU][1]," which "prevents the landowners from possession of their property *unencumbered by the easement*." *Ladd v. United States*, 630 F.3d 1015, 1023 (Fed. Cir. 2010) (emphasis added), *rehearing denied*, 2011 WL 2043242 (Fed. Cir. 2011); *see also Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006) ("The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law *reversionary property interests* that would otherwise vest in the adjacent landowners are blocked from so vesting." (emphasis added) (quoting *Caldwell v. United States*, 391 F.3d 1226, 1233 (Fed. Cir. 2005))).

"The question, then, … in the context of [a Trails Act] proceeding, [is] when are state law reversion interests forestalled by operation of section 8(d) of the Trails Act?" *Caldwell*, 391 F.3d at 1233.  Under South Carolina law, a railroad easement is extinguished where there is "both the intention to abandon and the external act by which such intention is carried into effect." *Eldridge v. City of Greenwood*, 388 S.E.2d 247, 251 (S.C. Ct. App. 1989).  In order for there to be an abandonment, "[t]here must be a concurrence of the intention with the actual relinquishment of the property," as well as "acts and conduct, positive, unequivocal and inconsistent with the claims of title." *Id.* "[A]n intent to abandon has been found in a railroad conveying its right-of-way to another for purposes other than a railroad." *Id.*

The facts establish that, but for the operation of the Trails Act, South Carolina's execution of the railbanking agreement would have effected an abandonment of the easement, resulting in a reversion to plaintiffs.  In the railbanking agreement, South Carolina "agree[d] to sell… as is and by quit-claim ... all of such right, title and interest that SELLER may have in the [railroad easement]" to BJWSA for "interim trail use," pursuant to the Trails Act.  (Railbanking

---

[1]     "The issuance of the NITU is the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." *Caldwell*, 391 F.3d at 1233-34 (emphasis in original).   "Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU." *Barclay*, 443 F.3d at 1373.

Agreement, Def. Ex. 2.)  The parties agree for purposes of these motions that interim trail use is beyond the scope of the original railroad easement.  By conveying the easement to the BJWSA for non-railroad use, South Carolina would have abandoned its right to the easement under state law, causing the property to revert back to plaintiffs in fee simple.  Because the Trails Act expressly prevents such reversion, plaintiffs have been subject to a taking that must be measured by reference to the fee simple value of their properties.

Defendant argues that "any measure of just compensation … should reflect the difference in value of plaintiffs' land at the time the NITU was issued (encumbered by a railroad easement) and after the issuance of the NITU encumbered by a trail easement subject to reactivation of a railroad easement."  (Def.'s Mot. for Partial Summ. J. at 10.)  Contrary to defendant's position, the extent of the taking depends not on plaintiffs' property interests at the time of the NITU, but rather "upon the nature of the state-created property interest that petitioners *would have enjoyed* absent the federal action and upon the extent that the federal action burdened that interest." *Anna F. Nordhus Family Trust v. United States*, No. 09-042L, 2011 WL 1467940, at *6 (Fed. Cl. Apr. 12, 2011) (quoting *Preseault I*, 494 U.S. at 24 (O'Connor, J., concurring)) (emphasis added).  This view is consistent with well-settled Federal Circuit precedent that "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that *would otherwise vest* in the adjacent landowners are blocked from so vesting." *Barclay*, 443 F.3d at 1373 (quoting *Caldwell*, 391 F.3d at 1233) (emphasis added); *see also Ladd*, 630 F.3d at 1023.  Because the easement would have reverted back to plaintiffs under state law, the fee simple value of plaintiffs' properties is the appropriate starting point in a damages analysis for just compensation; the appropriate measure of damages is the difference between the value of plaintiffs' land unencumbered by a railroad easement and the value of plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad.

Defendant also argues that the railbanking agreement cannot be construed as a state-law abandonment because "the railroad expressly retained its right to reacquire the land from the trail sponsor and reactivate rail service at any time in the future."  (Def.'s Mot. for Partial Summ. J. at 15.)  The Court does not agree; provisions in the railbanking agreement that provide for re-activation of the railroad "at some undefined time in the future are of course self-serving and not indicative of the facts and circumstances" at the time of the agreement.  *Preseault v. United States* ("*Preseault II*"), 100 F.3d 1525, 1548 (Fed. Cir. 1996).  Indeed, the possibility of South Carolina reactivating the railroad "exists purely in the realm of the hypothetical," and the Government has offered "[n]o evidence … of a present intent to reinstate rail service in the future." *Glosemeyer v. United States*, 45 Fed. Cl. 771, 780 (2000); *see also Ellamae Phillips Co. v. United States*, No. 04-1544L, Slip Op. at 5-7 (Fed. Cl. June 21, 2011); *Biery v. United States*, Nos. 07-693L, 07-675L, Slip Op. at 26-30 (Fed. Cl. June 9, 2011); *Capreal, Inc. v. United States*, No. 09-186L, Slip Op. at 18 (Fed. Cl. May 6, 2011); *Toews v. United States*, 53 Fed. Cl. 58, 63 (2002); *Schmitt v. United States*, No. 99-1852, 2003 WL 21057368, at *8 (S.D. Ind. March 5,

2003).  The preservation of the right to reactivate the railroad would not have prevented abandonment under South Carolina law.[2]

But for the Trails Act, the railbanking agreement would have effected an abandonment under South Carolina law, which would have caused the easement to revert back to plaintiffs. Plaintiffs' damages must therefore be determined by reference to the fee simple value of their properties, unencumbered by any railroad easement.  Ultimately, the measure of damages for just compensation must be the difference between the value of plaintiffs' land unencumbered by a railroad easement and the value of plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad.

### IV. CONCLUSION

For the reasons set forth above, plaintiffs' motion for partial summary judgment is granted, and defendant's motion for partial summary judgment is denied.

s/ Lawrence S. Margolis
LAWRENCE S. MARGOLIS
Senior Judge, U.S. Court of Federal Claims

---

[2]    *But see Troha v. United States*, 692 F. Supp. 2d 550, 559-60 (W.D.Pa. 2010) (holding that railbanking agreement precluded finding of abandonment); *Schneider v. United States*, No. 8:99CV315, 2003 WL 25711838, at *5 (D. Neb. Aug. 29, 2003) (same), *rehearing denied*, 2008 WL 2953550, at *2 (D. Neb. July 29, 2008).